# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| RACHELLE I. MOLLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:14-CV-00341-NKL |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Plaintiff Rachelle Moller seeks review of the Administrative Law Judge's (ALJ) decision denying her application for disability insurance and supplemental security income benefits under Titles II and XVI of the Social Security Act. [Doc. 14]. For the reasons set forth below, the ALJ's decision is reversed in part, and the case is remanded for further consideration.

## I. Background

### A. Medical Records

Moller alleges a disability onset date of July 13, 2011, from the combined effects of degenerative disc disease, chronic neck and back pain, headaches, diabetes mellitus, neuropathy and numbness in her left hand, legs and feet, carpal tunnel syndrome, anxiety, depression, bipolar disorder, poor concentration secondary to pain, and poor ability to interact with the public, coworkers and supervisors on a sustained basis. [Tr. 40-41].

Moller suffers from chronic back pain. The record shows consistent complaints of middle and lower back pain from April 2010 until August 2012. A May 2010 x-ray revealed hypertrophic spurring with near bridging spurs on the lower half of the thoracic spine and small hypertrophic spurs, mild degenerative joint disease and atherosclerotic vascular disease in the lumbar spine. [Tr. 278-79]. An MRI in May 2010 showed desiccation of the disc material at L2-3 and no evidence of disc herniation or central spinal canal stenosis. [Tr. 361]. Moller received two epidural steroid injections in April and June 2011, but reported no improvement. [Tr. 366-69].

A September 2011 CT scan of Moller's spine revealed "[p]rominent extradural defects on the left side at C4-C5 and C5-C6 due to endplate spurring and associated disc bulging." [Tr. 444]. In October 2011, Moller complained that the bulging disc in the back of her neck caused her left arm to go numb. [Tr. 425]. Four days after this complaint, Moller underwent surgery for a cervical microdiscectomy of C4-C5 and C5-C6, a corpectomy of the C5 vertebral body, fibular strut grafting of C4 through C6, and cervical plating of C4 through C6. [Tr. 446-452]. In November 2011, at a follow-up appointment, the nurse practitioner stated that Moller was "recovering well" and that her incision was giving her minimal discomfort. [Tr. 426]. Moller complained of muscle spasms in the back of her neck, continued numbness in her left arm, weakness in her hand grip, and weakness in her arm muscles. *Id.* In December 2011, at another follow-up appointment, Moller complained of numbness in both arms. [Tr. 428]. Moller complained that using pain medication was difficult because it inhibited her from caring for her grandson. *Id.* In January 2012, Moller complained of persistent numbness in

some fingers on her right hand and all fingers on her left hand. [Tr. 430]. She stated her fingers "lock up" and that she could not pick things up. *Id.* Moller's specialist, Dr. Wilkinson, remarked that Moller "certainly could not return to work" as a CNA "at this point." *Id.* Dr. Wilkinson observed weakness in her left arm and the muscles of her thumb and little finger. In February 2012, a CT revealed an intact anterior metallic plate stabilized by screws at C4 and C6 and a bone graft at C5. [Tr. 453-55]. In March 2012, after reviewing a CT, Dr. Wilkinson determined that a posterior foraminotomy was necessary to decompress a particular nerve affecting Moller's left fingers. Dr. Wilkinson noted that Moller had a foraminal stenosis at C5-C6 on the left from osteophytic change. In addition to decompressing the nerve at Moller's C5-C6, Dr. Wilkinson recommended that surgery be done on the median nerve of Moller's wrist. [Tr. 432]. This surgery was performed in May 2012. [Tr. 459-63]. In June 2012, Dr. Wilkinson noted that Moller still had numbness in the index finger and thumb of her left hand, but that her sensation seemed to be improving. [Tr. 469]. In August 2012, Dr. Wilkinson noted that Moller's pain was better and that she was doing "fairly well," but that she still had persistent numbness in her thumb and little finger. [Tr. 472].

Moller also has a history of documented complaints and diagnoses of anxiety and depression. Moller complained of anxiety and depression from January to July 2010 and again in August 2011. [Tr. 288-299, 487]. Her primary care physician, Dr. Amber Campbell, prescribed various medications for anxiety and depression.

The medical records also reveal a history of insulin-dependent diabetes mellitus, which was often described as uncontrolled. *See e.g.* [Tr. 293, 485, 489-90]. Moller also

3

complained of frequent headaches. The record also reveals diagnoses of hypertension. *See e.g.*, [Tr. 493, 503].

### B. Medical Opinions

Both Moller's treating physician, Dr. Amber Campbell, and her treating surgeon, Dr. Wilkinson, submitted medical opinions regarding Moller's physical ability to work. [Tr. 381-82, 398-99]. There is also an opinion from a non-examining state agency consultant, Dr. Karen Sarpolis. [Tr. 401-5]. These opinions will be compared in detail to the ALJ's residual functional capacity (RFC) determination below.

Dr. Campbell also submitted an opinion on Moller's mental limitations. [Tr. 384-85]. In August 2011, Dr. Campbell opined that Moller had marked limitations in the ability to interact appropriately with the public, supervisors, and coworkers and the ability to respond appropriately to usual work situations and to changes in a routine work setting. [Tr. 385]. Moller was extremely limited in her ability to complete a normal work-day and week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest. *Id.*

### C. ALJ's Opinion

After a hearing, the ALJ issued an unfavorable decision, finding at Step 5 of his determination that Moller could perform work that existed in significant numbers in the national economy, including as an address clerk, laminator, and patcher. [Tr. 21]. Moller had the following severe impairments: degenerative disc disease of the cervical spine with a history of two surgeries, degenerative disc disease of the thoracic and lumbar spine, carpal tunnel syndrome, diabetes mellitus, depression, and anxiety. [Tr. 13].

4

Moller had the RFC to perform sedentary work, including lifting and carrying ten pounds occasionally and less than ten pounds frequently, and standing and walking two hours and sitting six hours in an eight-hour workday. Moller cannot perform repetitive pushing or pulling with her upper extremities. She can occasionally climb, balance, stoop, kneel, crouch, crawl, and bilaterally reach in all directions. She can frequently handle, finger, and feel with her left dominant hand. She must avoid concentrated exposure to vibration, temperature extremes, and hazards such as unprotected heights and dangerous moving machinery. She can engage in occasional contact with the general public and occasional interaction with coworkers and supervisors. [Tr. 15].

In coming to his conclusion the ALJ gave "little weight" to Dr. Campell's opinions about Moller's physical limitations because on the day Dr. Campbell filled out the assessment, Moller had only tenderness to palpitation of the lumbar spine, had full strength in all limbs, and had a normal gait. She had not consistently presented with decreased strength or decreased sensation in her lower extremities. Dr. Campbell's opinion was also inconsistent with Moller's ability to care for her grandson. [Tr. 19]. Dr. Campbell's opinion of Moller's mental limitations was also given "little weight" because "significant deficits in memory, concentration, judgment, or temperament were not consistently observed," Moller was never hospitalized, and because Dr. Campbell only occasionally treated Moller for mental health symptoms. *Id.*

The ALJ gave Dr. Wilkinson's opinion "little weight" because it was inconsistent with Moller's activities of daily living. The ALJ also stated that Dr. Wilkinson had observed that Moller was "doing fairly well" other than suffering from persistent

5

numbness in two fingers. *Id.* The ALJ also stated that Dr. Wilkinson and other treatment providers did not document persistent and significant weakness of the upper extremities.

The opinion of the non-examining state agency consultant, Dr. Sarpolis, was given "some weight." The ALJ stated that Dr. Sarpolis' opinion that Moller should engage in sedentary work was consistent with Moller's "moderate physical signs on examination" and activities of daily living. *Id.* However, the ALJ declined to adopt some of the consultant's postural, manipulative, and environmental limitations because subsequent evidence was more consistent with the ultimate RFC determination. [Tr. 20].

## II. Discussion

Moller argues that the ALJ's determination that "little weight" was due to the opinions of her treating physicians is not supported by substantial evidence in the record and that her treating physicians should have been contacted for clarification of their opinions regarding her ability to work after her second surgery.

### A. Assessment of Moller's Mental Impairments

The ALJ gave "little weight" to Dr. Campbell's opinion regarding Moller's mental impairments and determined that Moller could engage in occasional contact with the general public and occasional interaction with coworkers and supervisors. This determination, and the weight given to Dr. Campbell's mental assessment, is supported by substantial evidence.

In his decision, the ALJ stated that Dr. Campbell's opinion of Moller's mental limitations were inconsistent with Dr. Campbell's treatment notes. The ALJ stated that "[o]n objective examination, [Moller] occasionally exhibited some low mood or flat

6

affect, but significant deficits in memory, concentration, judgment, or temperament were not consistently observed by Dr. Campbell." [Tr. 19]. However, the ALJ does not explain why deficits in memory, concentration, judgment, or temperament would need to be present to corroborate the depression or anxiety alleged by Moller or the functional limitations noted by Dr. Campbell.

Nonetheless, the ALJ gave other reasons for finding that Moller's depression and anxiety were severe, but not disabling, and for finding that Dr. Campbell's opinion was due little weight. For instance, the ALJ pointed out that Moller was primarily treated through a primary care physician (rather than a specialist), [Tr. 18], Dr. Campbell only treated Moller occasionally for her mental health symptoms, [Tr. 19], and Moller had never been admitted to inpatient psychiatric treatment, [Tr. 18]. *See Kirby v. Astrue,* 500 F.3d 705, 708–09 (8th Cir.2007) (affirming ALJ's finding that claimant did not suffer significant impairment due to psychiatric illness when claimant had never had any formal treatment by psychiatrist, psychologist, or other mental health professional on a long-term basis); *Roberts v. Apfel,* 222 F.3d 466, 469 (8th Cir.2000) (affirming the ALJ's conclusion that mental impairments were not disabling when there was no evidence "of ongoing counseling of psychiatric treatment or of deterioration of change in [claimant's] mental capabilities"); *Vanlue v. Astrue,* 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (affirming the ALJ's finding that depression was not a severe impairment where the claimant had sought only minimal and conservative treatment and the claimant never required more aggressive forms of mental health treatment than medication).

7

Moller argues that the ALJ erred by discounting Dr. Campbell's opinion on the basis that Moller had never been hospitalized for psychiatric treatment. While psychiatric hospitalization is not required for an ALJ to find mental disability, the lack of psychiatric hospitalization is a factor the ALJ may consider. *See Lewis v. Colvin*, 973 F. Supp. 2d 985, 1004 (E.D. Mo. 2013) (remarking that the claimant had not received psychiatric hospitalization and citing Eighth Circuit cases considering the conservative measure of mental health treatment as a factor in an ALJ's decision).

Further, the ALJ did not consider Moller's lack of psychiatric treatment as a sole factor in making his decision. As discussed above, the ALJ also looked at the frequency of Moller's treatment and who treated her. The record also reveals that Moller was regularly prescribed medication for her depression and anxiety once she complained to Dr. Campbell in January 2010 and that after July 2010, Dr. Campbell's notes do not document anxiety or depression complaints again, with the exception of once in August 2011. [Tr. 288-299, 487]. This suggests that Moller's anxiety and depression were controlled by medication. Conditions which can be controlled by treatment are not disabling. *See Davidson v. Astrue,* 578 F.3d 838, 846 (8th Cir. 2009); *Schultz v. Astrue,* 479 F.3d 979, 983 (8th Cir. 2007) (holding that if impairment can be controlled by treatment, it cannot be considered disabling); *Medhaug v. Astrue,* 578 F.3d 805, 813 (8th Cir. 2009). In the ALJ's Paragraph B assessment, the ALJ also remarked that Moller had no problem caring for herself or in part for her grandson. She could prepare meals for herself, grocery shop, and handle her finances. [Tr. 14]. As to Moller's allegations regarding social impairments, the ALJ referred to Moller's Adult Function Report where

8

she denied difficulty getting along with others and stated she got along "ok" with authority figures. *Id.*

There were also inconsistencies in Moller's testimony regarding her activities of daily living and her ability to get along with others. At her hearing in October 2012, Moller testified that she does not get along well with people when she is left alone with them for any period of time, that she has a "big mouth," and that she will "snap." [Tr. 60]. She testified that she had been written up several times for insubordination at her prior jobs and can be "defiant at times." *Id.* However, in August 2011, the same month Dr. Campbell determined that Moller was markedly to extremely limited in some areas of mental functioning, Moller completed an Adult Function Report. [Tr. 241-51]. Although Moller described herself as a "homebody" who hardly went anywhere, she stated that she spent time with others on the phone and in person. [Tr. 245-46]. She also stated that she had no difficulty managing her finances, that she paid attention "well," followed written and spoken instructions "good," and that she watched television "all the time – very well." [Tr. 245-47]. Moller stated that she had no problem getting along with family, friends, or neighbors, got along "ok" with authority figures, and had never been fired or laid off due to problems getting along with others. [Tr. 246-47].

The inconsistencies in Moller's testimony, the limited scope of treatment for her psychological impairments, and the fact that medication appeared to control Moller's mental health related impairments constitute substantial evidence in support of the ALJ's decision.

### B. Physical Impairments

Moller argues that the weight given to Dr. Campbell's and Dr. Wilkinson's opinions regarding her physical limitations is not supported by substantial evidence. "A treating physician's opinion is given 'controlling weight' if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005); SSR 96-2P. In any case, the ALJ must provide good reasons for the weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2); *see also Brown v. Astrue*, 611 F.3d 941, 951-52 (8th Cir. 2010).

The Medical Source Statement-Physical forms filled out by Moller's treating physicians, Dr. Campbell and Dr. Wilkinson, and the state agency consultant, Dr. Sarpolis, are largely consistent with each other and with the ALJ's RFC determination. Limitations related to lifting, sitting, standing, and walking are fairly consistent among all four determinations. For example, Dr. Campbell and Dr. Sarpolis opined that Moller could lift and carry ten pounds occasionally, and Dr. Wilkinson opined that Moller could lift less than ten pounds occasionally. The ALJ determined that Moller could lift ten pounds occasionally. Dr. Campbell and Dr. Sarpolis opined that Moller could stand or walk for two hours and sit for six hours, and Dr. Wilkinson opined that Moller could stand or walk for less than two hours and sit for less than six hours. The ALJ determined Moller could stand or walk for two hours and sit for six hours. Dr. Campbell opined that Moller was limited in her ability to push and pull with both her upper and lower extremities, Dr. Wilkinson opined that Moller was limited by her upper extremities, and Dr. Sarpolis determined that she had no pushing or pulling limitations. The ALJ

10

determined that Moller could perform "non-repetitive" pushing and pulling with her upper extremities. Dr. Campbell stated that Moller should not be exposed to cold, heat, humidity, vibrations, or hazards while Dr. Wilkinson and Dr. Sarpolis opined that Moller had no environmental limitations. The ALJ determined that Moller should avoid concentrated exposure to environmental factors and hazards. However, two significant deviations exist regarding Moller's postural limitations and her manipulative limitations, and Moller argues that the ALJ's determination that Dr. Campbell's and Dr. Wilkinson's opinions were due "little weight" is not supported by substantial evidence.

First, both Dr. Campbell and Dr. Wilkinson opined that Moller should never climb, crouch, or crawl. Dr. Sarpolis opined that Moller could occasionally do these things, and the ALJ adopted Dr. Sarpolis' limitation. The ALJ's determination that Moller could occasionally climb, crouch, and crawl is supported by substantial evidence. In giving Dr. Campbell's opinion of Moller's limitations "little weight," the ALJ stated that "the limits detailed by Dr. Campbell are inconsistent with [Moller's] reported activities of daily living, in particular as the caregiver of her grandson." [Tr. 19]. Moller argues that the record does not support the ALJ's observation that Moller could engage in extensive daily activities. In particular, Moller points to her testimony at the hearing before the ALJ that she was limited to lying down with her grandson and napping with him. However, the ALJ specifically discussed the inconsistencies between Moller's testimony at the hearing and her previous statements to doctors. For instance, in December 2011, Moller told a nurse practitioner that although it made her back pain worse, she lifts, carries, and cares for her grandson "every day all day." [Tr. 428]. She

11

also stated she "is the only one who is able to do this." *Id.* In July 2012, Moller reported that she did not exercise "except running after her grandson." [Tr. 501]. In choosing to believe that Moller cared more extensively for her grandson than she testified to, the ALJ conducted a credibility analysis. Moller's credibility is primarily for the ALJ to decide, and the Court will defer to the ALJ's credibility finding related to the extensiveness of Moller's care for her grandson because the ALJ gave good reasons for doing so. *See Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). The ALJ pointed to inconsistencies within Moller's testimony, and those inconsistencies are supported by substantial evidence.

Moller also argues that the ALJ discounted Dr. Campbell's and Dr. Wilkinson's opinions because they were inconsistent with Moller's activities of daily living, but that the ALJ did not give specific examples of those inconsistencies other than the care of her grandson. However, in an earlier section of the ALJ's opinion, the ALJ observed that in her Adult Function Report, Moller reported that although she experienced some difficulty in doing so, she could care for herself, could care somewhat for her grandson, and could occasionally prepare simple meals and grocery shop. [Tr. 17, 242-44]. These statements, but particularly Moller's earlier statements related to the care of her grandson, support the ALJ's conclusion that Moller's activities of daily living are inconsistent with Dr. Campbell's and Dr. Wilkinson's opinion that Moller could never climb, crouch, or crawl.

Moller also contends that the ALJ speculated regarding the significance of various findings on exams of Moller. For instance, the ALJ observed that Moller "has not consistently presented with decreased strength or decreased sensation of the lower

12

extremities, such that the limits of Dr. Campbell identified are inappropriate." [Tr. 19]. Moller argues that no explanation is provided by the ALJ, and no medical or legal authority is cited, to support his lay speculation that observations of decreased strength or sensation would be necessary to corroborate complaints of chronic pain. However, the ALJ's consideration of these medical findings does not necessarily mean that the ALJ disbelieved Moller's allegations of pain. The findings do, however, directly address Dr. Campbell's opinion that despite no consistent findings of decreased strength or sensation in the lower extremities, Moller could never climb, crouch, or crawl. Further, the ALJ also pointed out that within one day of filling out the Medical Source Statement which limited Moller's ability to work due to chronic pain, [Tr. 381-82], Dr. Campbell observed only "tenderness to palpitation of the lumbar spine." [Tr. 487]. The ALJ's opinion regarding Moller's ability to occasionally climb, crouch, or crawl – rather than never climb, crouch, or crawl as opined by Dr. Campbell and Dr. Wilkinson – is supported by substantial evidence.

The second deviation that existed between Dr. Campbell, Dr. Wilkinson, Dr. Sarpolis, and the ALJ involved Moller's manipulative functioning. While Dr. Campbell opined in August 2011 that Moller had no limitations in her ability to handle, finger, and feel, Dr. Wilkinson, who specifically treated Moller's hand pain and numbness in 2012 and performed surgery on her cervical spine and wrist to alleviate this problem, opined that Moller was limited in her ability to reach, handle, finger, and feel. Like Dr. Campbell, Dr. Sarpolis opined that Moller had no limitations. The ALJ determined that Moller could frequently handle, finger, and feel. This determination is particularly

13

important because the vocational expert testified that if Moller was limited to only occasional – rather than frequent – handling, fingering, and feeling, the jobs the ALJ determined that Moller could do would not be available. [Tr. 74].

The ALJ discounted Dr. Wilkinson's opinion because the opinion was prior to Moller's second neck and hand surgery and was inconsistent with the last visit of record. The ALJ stated that in the last visit of record, which was after Dr. Wilkinson filled out the Medical Source Statement, Moller reported "doing fairly well" other than suffering from persistent numbness in two fingers. Moller also reported cessation of narcotic medications. [Tr. 19]. However, "doing fairly well" in the context of a post-surgery appointment is not evidence that Moller's hand numbness was completely resolved or that she was capable of frequent fingering and handling in a competitive, full-time work environment. *See Hutsell v. Massanari*, 259 F.3d 707, 712-13 (8th Cir. 2001)("[D]oing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity."). The record states that Moller still had persistent numbness in her thumb and little finger. [Tr. 472]. The ALJ does not explain how a finding that she can frequently handle, finger, and feel is consistent with medical records that consistently document dominant hand finger numbness even post-surgery. Further, although Dr. Campbell opined that Moller did not have any limitations in her ability to handle, finger, and feel, that opinion was in August 2011, which was two months before Moller underwent the back surgery which was suspected to have caused the neuropathy in her left hand.

14

Case 4:14-cv-00341-NKL   Document 18   Filed 02/10/15   Page 14 of 15

Because Moller's second surgery was after both Dr. Campbell and Dr. Wilkinson completed the Medical Source Statement-Physical forms in the record, it is unclear whether the limitations opined by Dr. Campbell and Dr. Wilkinson still existed or were even worse at the time the ALJ made his determination regarding Moller's manipulative functioning. Remand is necessary so that the ALJ may request an updated opinion regarding Moller's manipulative (handle, finger, feel, etc.) limitations. On remand, the ALJ shall seek an opinion from Dr. Wilkinson, who ordered and performed Moller's hand surgery, as to Moller's manipulative limitations after her second surgery. If necessary after Dr. Wilkinson provides a new opinion, the ALJ shall determine a new RFC and enlist the expertise of a vocational expert to determine if Moller can perform jobs that exist in significant numbers in the national economy.

### III. Conclusion

For the reasons set forth above, the ALJ's decision is reversed in part, and the case is remanded for further consideration consistent with this Order.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: February 10, 2015
Jefferson City, Missouri